**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 20, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JAMES EDWARD CLAYTON,

Petitioner - Appellant,

v.

SCOTT CROW, DOC Director,

Respondent - Appellee.

No. 20-7015
(D.C. No. 6:16-CV-00423-RAW-KEW)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT***
_____

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

James Edward Clayton has been in the State of Oklahoma's custody since

1982, but the intervening forty years have not been enough to settle certain questions

about whether Clayton was properly convicted and sentenced.  Those questions have

already generated four decisions from this court alone.

Clayton's case returns to us again following the district court's denial of his

most recent 28 U.S.C. § 2254 petition, filed in 2016.  As relevant here, that petition

---

* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

claimed that Clayton received ineffective assistance of counsel at the guilty-plea phase, and that his guilty plea did not have an adequate factual basis.  We granted a certificate of appealability (COA) regarding Clayton's ineffective-assistance claim, and we *sua sponte* ordered briefing on a jurisdictional issue.

For the reasons explained below, we find: (i) the district court properly exercised jurisdiction over Clayton's claims; (ii) the state court's resolution of Clayton's ineffective-assistance claim was based on an unreasonable factual determination, so it is not entitled to deference; (iii) upon de novo review of that ineffective-assistance claim, Clayton fails to establish prejudice (specifically, a reasonable probability that he would have insisted on going to trial); and (iv) Clayton's claim that his guilty plea lacked an adequate factual basis does not meet the standard for a COA.  We therefore affirm the district court's judgment as to the ineffective-assistance claim, although for different reasons than those given by the district court, and we deny a COA as to the inadequate-factual-basis claim.

I.    BACKGROUND & PROCEDURAL HISTORY

This case's lengthy history can be generally divided into three phases, which we describe in turn.

A.    Phase One: First Guilty Plea, Appeal, and First Round of Collateral Review (1982–2003)

In December 1982, Clayton robbed a pharmacy in Muskogee, Oklahoma. Driving away from the scene of the crime, he ran a red light, struck another vehicle, and killed its occupant.  Oklahoma charged Clayton with second-degree murder and

2

four other crimes related to the event (*e.g.*, theft from the pharmacy, theft of a motor vehicle). The state also alleged seven prior convictions, for sentence-enhancement purposes.

On the morning of trial, Clayton pleaded guilty with no promises or concessions from the prosecutor or court (sometimes called an open plea or a blind plea), waived a pre-sentence report, and was sentenced immediately to life imprisonment on the murder charge, but with the possibility of parole. On the other charges, he received various definite prison terms (the longest being thirty years). The judge ordered all of Clayton's sentences to run concurrently.

Clayton quickly sought to withdraw his guilty plea, arguing he had not been competent to enter it. The trial court denied that motion, and the Oklahoma Court of Criminal Appeals (OCCA) affirmed.

Over the next two decades, Clayton litigated state and federal postconviction challenges. Those challenges culminated in a federal writ of habeas corpus issued in 2003, requiring the state to permit Clayton to withdraw his guilty plea.

### B. Phase Two: Second Guilty Plea, and Second Round of Collateral Review (2004–2013)

Returning to state court, Clayton received appointed defense counsel, Albert J. Hoch, Jr., and withdrew his guilty plea. Clayton thus reverted to pretrial-detainee status, and Oklahoma transferred him from prison to county jail to await his decision whether to go to trial, or to again plead guilty.

In September 2004, Clayton met with Hoch and then chose to repeat his decision from more than twenty years earlier, *i.e.*, he entered a blind plea to all the charges. On a court-mandated form (which Hoch filled out on Clayton's behalf, *see* Aplt. App. vol. II at 77–78), the answer "No" is circled for the question, "Have you been . . . promised anything by anyone to have you enter your plea(s)?" Aplt. App. vol. V at 7.

Upon accepting Clayton's plea, the trial court similarly repeated its decision from more than twenty years earlier, immediately imposing a life-with-parole sentence for the second-degree murder charge and various concurrent terms of years for the other charges.

Shortly after sentencing, Clayton wrote a letter to the trial judge stating, "I would feel better had you given me a sentence I can/could discharge. However, I accept what I have been given. I am thankful and wish for you to know that I will do my utmost to secure my release via parole . . . ." Record on Appeal at 205, *Clayton v. Ward*, No. 08-7038 (10th Cir. Sept. 19, 2008).

A few days later, however, Clayton wrote a letter to Hoch (his attorney) expressing concern over whether he had received the sentence he expected. That letter included a claim that Hoch had arranged a deal by which Clayton would be granted parole by December 2004:

> Mr. Hoch, at the time of our discussion [ahead of the change-of-plea hearing] you told me and my family I would receive credit for time served from 1982, with credit for good-time; that I would be put on the November 2004 [parole] docket and be home with my wife by Christmas

(2004).  Another attorney told my wife this was not possible. . . .  Mr. Hoch, you know I would <u>not</u> have plea[ded] blindly to the murder charge without your assurances I would be home with my family by Christmas (2004) and that I would receive credit for time from 1982, with credit for good-time.  We discussed this several times!

Mr. Hoch, as you told me—I said nothing at [the] time of my plea and sentencing because you said you had it "worked out" and we didn't want [Oklahoma Attorney General] Drew [Edmondson] getting involved.  I ask[ed] you to appeal—just to insure everything went right and I would dismiss the appeal when I got out.

. . .

Mr. Hoch, in view of these matters I am requesting you to appeal or withdraw my plea to count one (murder) . . . .  Have you arranged for me to be paroled in December 2004?

Aplt. App. vol. IV at 245–47.

Almost a year later, Clayton filed a new postconviction challenge in the sentencing court basically reiterating the claims made in his letter to Hoch.  Clayton said Hoch "made certain specific representations to [him], and his family, that if [he pleaded guilty] he would be released on Parole in December, 2004."  Record on Appeal at 46, *Clayton v. Ward*, No. 08-7038.  Clayton also claimed Hoch had failed to file an appeal from the guilty plea on his behalf.  *See id.* at 47–48.

The trial court rejected these claims and the OCCA affirmed, finding that Clayton was legally sophisticated, understood his appeal deadline, and could have instituted an appeal himself, but did not.  Therefore, he had waived his challenges for failure to bring them on direct appeal.

5

Clayton then filed a new § 2254 petition in the district court, pleading the same claims. In an affidavit, he asserted that Hoch claimed to have arranged an unwritten deal with the court and the Oklahoma Attorney General's Office that if Clayton pleaded guilty, he would be placed on the November 2004 parole docket and would be granted parole by Christmas 2004. But Hoch advised Clayton not to discuss the deal in open court because a reporter might be present and news of the deal might embarrass Attorney General Edmondson. Also, Hoch advised that Clayton "would be granted credit for all [his] time served since 1982, to include 'good-time' credits (which would probably reduce [his] other charges to 'fully served' or 'discharged' status)." Aplt. App. vol. V at 62. Clayton agreed to this deal but instructed Hoch to appeal the guilty plea anyway, just in case the deal fell through. He gave the same instructions after the hearing, and repeatedly attempted to call Hoch in the ten days afterward (the appeal window) to ensure an appeal would be filed. Clayton also said that, but for Hoch's promises, he "would not have pleaded blindly to the Second Degree Murder charge" and "would have exercised [his] right to [a] jury trial." *Id.* at 64.

After lengthy proceedings, including two appeals to this court, the district court entered an order in January 2013 requiring Oklahoma to allow Clayton an appeal out of time from his 2004 guilty plea—thus reinstating Clayton's opportunity to argue (to the state court, in the first instance) that he would not have entered a blind plea but for Hoch's promises. Clayton therefore returned to state court again in about February 2013.

6

**C.      Phase Three: Direct Appeal from 2004 Guilty Plea, and Third Round of Collateral Review (2013–present).**

1.      Clayton's Motion to Withdraw the Guilty Plea

An Oklahoma defendant who wishes to appeal from a guilty plea must first move to withdraw the plea. *See Clayton v. Jones*, 700 F.3d 435, 441 (10th Cir. 2012) (summarizing the procedure). So Clayton's out-of-time appeal began with a motion in the state trial court to withdraw his 2004 guilty plea. He asserted two bases:

- his 2004 guilty plea was not knowing, intelligent, or voluntary "due to coercion, misadvise [*sic*], misrepresentation and false assurances of Attorney Hoch regarding how long he would be in prison, parole and credits for time [served]," Aplt. App. vol. III at 66; and

- the plea lacked a sufficient factual basis because he had only admitted to driving in an unsafe manner, which (he argued) was not enough to prove the "depraved mind" element of second-degree murder in Oklahoma.

2.      The State Court Evidentiary Hearing

The state trial court held a hearing on Clayton's motion in 2014. Clayton was represented by counsel.

Clayton first called Hoch as a witness. Hoch denied promising or advising Clayton that he would be paroled by Christmas 2004, and he had no memory of receiving post-sentencing letters from Clayton. But he confirmed that he believed Clayton had served far more time than expected. In Hoch's experience, the

Oklahoma Department of Corrections "ha[d] been treating life [with the possibility of parole] as 45 [years] for quite some time," Aplt. App. vol. II at 66, and he believed that "you can discharge a life [sentence]," *id.* at 72, meaning an inmate can earn credit against that presumptive forty-five years and therefore satisfy the sentence early.

Given his forty-five-year assumption and knowing that Clayton had already served over twenty years (as of the 2004 sentencing), Hoch further testified that he "probably [gave Clayton] some estimate of time [before Clayton would be discharged]. . . . [A] couple [of years] or something like that. . . . [B]ack then if you had done 50 percent of anything, you were done." *Id.* at 78–79. Hoch encouraged the trial judge to contact "Mr. Moore," an administrator within the Oklahoma corrections system who could "review [Clayton's] time credits because, honestly, I think he's probably got enough time credits he should have [been] discharged [by now]." *Id.* at 83.

In sum, while denying that he had made promises about a specific release date, Hoch testified he had probably given advice about how long Clayton would still need to serve before being released. However, Hoch said he framed his advice in terms of outright discharge based on serving half of the presumptive forty-five years—in contrast to Clayton's claim about a promise of parole by December 2004.

The only other witness at the hearing was Clayton himself. As relevant here, he testified consistent with his previous allegation, *i.e.*, that he pleaded guilty in September 2004 because Hoch told him, "You'll come up for parole in November

and you'll be out by Christmas with your family." *Id.* at 90.  When cross-examined about this story, Clayton reaffirmed his narrative and added,

> [S]top and think about this: I had already been in jail for 15 months [following the original grant of habeas relief] and I had refused to plead guilty to that murder, so why would I just all of the sudden just get this visionary experience that I want to go plead guilty to this murder?

*Id.* at 102.  Clayton said nothing, however, about Hoch's testimony regarding discharge based on serving half of forty-five years.

As for the pre-plea form Clayton signed, in which he represented he had not been promised anything to induce him to plead guilty, Clayton flatly denied that Hoch had read that part of the form to him.  Clayton also volunteered that he "probably would've signed [the pre-plea form] regardless of what it said" because he believed he "was getting ready to get out, to being pretty close to getting out." *Id.* at 100.

As stated above, Clayton's motion to withdraw his plea also included a claim that the plea lacked an adequate factual basis for the "depraved mind" element of second-degree murder.  As to that, Clayton testified that neither Hoch nor anyone else had advised him about that element of the offense.

Finally, Clayton placed at least two affidavits into the record.  The first was from his minister, who was present at the pre-plea conference between Clayton and Hoch and who remembered Hoch saying "that if Mr. Clayton would enter the plea, that he (Mr. Clayton) would come up on the Parole Board's docket in November of 2004, and would be granted parole, and be released, the next month."  Aplt. App.

9

vol. V at 75.  The second was from his brother-in-law, who was also present at the

pre-plea conference and remembered Hoch saying that if Clayton "would enter a

blind plea to the second degree murder charge, [he] . . . would be on the November,

2004, Parole Board Docket, and . . . would be home [paroled] for Christmas 2004."

*Id.* at 81 ("[paroled]" in original).

There was a third affidavit available to Clayton at the time, from his wife, who

was also present at the pre-plea conference with Hoch.  Clayton's wife recounted

essentially the same story as Clayton, his minister, and his brother-in-law.  It is

unclear whether Clayton introduced his wife's affidavit at the hearing, but there

seems to be no dispute that the affidavit somehow made its way into the state-court

record.

### 3.    Post-Hearing Briefing

Before and during the hearing, Clayton's theory was that Hoch had induced

him to plead guilty through the promise of an unwritten parole deal.  Hoch denied

that, but volunteered that he had probably given advice about entitlement to

discharge based on time served.  So Clayton filed a supplemental brief highlighting

Hoch's testimony about discharge and recounting post-hearing phone calls to

"Mr. Moore" at the Oklahoma Department of Corrections, who told both the judge

and Clayton's postconviction attorney "that in fact a life sentence cannot be

discharged."  Aplt. App. vol. III at 220.  In other words, Clayton's only hope for

early release was parole.  This, said Clayton, showed that Hoch's discharge advice

was legally erroneous.  But, perhaps recognizing that his pre-hearing theory (an

10

unwritten parole deal) is not the same as his post-hearing theory (advice about discharge through time served), Clayton attempted to blend the two theories by asserting, "It makes sense that Hoch would . . . believe that Clayton would be home at or around Christmas [2004] because Hoch thought that Clayton was close to discharging [his sentence] in any event." *Id.* at 223.

### 4.    The State Court's Resolution

The trial court resolved Clayton's motion through a written decision.  The court confirmed that it and Clayton's attorney had spoken to Mr. Moore and learned that the Oklahoma Department of Corrections "will not discharge a life sentence with good time or credits." *Id.* at 253.  But the court held that "[t]he fact that the Defendant believed his sentence would be 'discharged' is not a legal basis for a withdrawal of the plea." *Id.*  As to Clayton's claim that the plea lacked an adequate factual basis, the court found the documents supporting the plea, and the plea hearing transcript, provided a sufficient factual basis.  The court therefore denied Clayton the opportunity to withdraw his 2004 plea.

On direct appeal, the OCCA affirmed the trial court's adequate-factual-basis ruling for the reasons given by the trial court, holding that "[k]illing a person in [the circumstances admitted in the plea agreement] can be punishable as murder under Oklahoma law." Aplt. App. vol. I at 187.  As for the voluntariness of Clayton's plea, however, the OCCA affirmed on slightly different grounds.  The trial court assumed Clayton pleaded guilty under the belief that he could discharge a life sentence through time served but declared it legally irrelevant, whereas the OCCA found

11

Clayton's story incredible, at least as to whether Hoch's alleged advice motivated him to plead guilty: "There is no credible evidence that [Clayton] pleaded guilty because of counsel's prediction or promise that he would be paroled, or that he would eventually 'discharge' his life sentence," *id.*

Clayton then filed another state postconviction challenge in the trial court, asserting the same claims. The trial court ruled that the OCCA had rejected those claims on direct appeal and so the OCCA's ruling was res judicata. The OCCA affirmed.

### 5.    Clayton's § 2254 Petition

From there, Clayton returned to federal court with another § 2254 petition— the one now at issue. As relevant here, he asserted two claims:

- Claim 1—Hoch rendered ineffective assistance of counsel ahead of Clayton's 2004 guilty plea; and

- Claim 2—the 2004 plea was not supported by an adequate factual basis.

The district court found that the OCCA's resolution of both claims was within the bounds permitted by 28 U.S.C. § 2254(d). As to claim 1, the court further held that Clayton had not shown prejudice, *i.e.*, that he likely would have gone to trial absent Hoch's advice. The court therefore denied relief.

Clayton then moved for a COA from this court, which we granted as to claim 1. We also *sua sponte* ordered the parties to brief "whether the § 2254 petition at issue, or any part of it, is a 'second or successive' petition for purposes of 28 U.S.C.

12

§ 2244(b), such that petitioner was required to apply for this court's authorization before filing it in the district court." Order at 2 (Oct. 5, 2021).

## II.     JURISDICTION

"An appellate federal court must satisfy itself not only of its own jurisdiction, but also of that of the lower courts in a cause under review." *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934).[1] Clayton has filed *two* § 2254 petitions challenging his 2004 conviction: the first in 2006 ("2006 petition"), resolved in 2013 with an order that the state must give Clayton an out-of-time appeal (really meaning an out-of-time motion to withdraw his 2004 guilty plea); and the second in 2016 ("2016 petition"), currently at issue. If the 2016 petition is "second or successive" for purposes of 28 U.S.C. § 2244, then the district court lacked jurisdiction to adjudicate it because this court did not authorize Clayton to file it. *See* § 2244(b)(3)(A) ("Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.").

In a 28 U.S.C. § 2255 proceeding, this court held that "when the granting of the prior [§ 2255] motion merely reinstated the right to a direct appeal, the first subsequent motion is not a second or successive motion under AEDPA." *United States v. Scott*, 124 F.3d 1328, 1330 (10th Cir. 1997) (per curiam). We have no

---

[1] We accordingly reject Clayton's argument that this court somehow erred when it raised the question of the district court's jurisdiction *sua sponte*. *See* Opening Br. at 37–38.

published authority extending this holding to § 2254, but neither can we see any reason why § 2254 and § 2255 should be treated differently in this context. *Cf. Storey v. Vasbinder*, 657 F.3d 372, 378 (6th Cir. 2011) (holding, in the § 2254 context, that "a petition filed after a remedial appeal, ordered in response to an earlier petition, is not second or successive within the meaning of § 2244(b)—even if it includes claims that could have been included, but were not, in the first petition"). Accordingly, we deem the 2016 petition to be, in effect, Clayton's first attack on his 2004 conviction, so Clayton did not need this court's prior authorization to file it.

## III.    MERITS ANALYSIS OF INEFFECTIVE-ASSISTANCE CLAIM

We now turn to the merits of Clayton's ineffective-assistance claim, which is the only one of his claims for which we granted a COA. We may not grant § 2254 relief on this claim unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Clayton says the OCCA's decision fits both categories. We will address his arguments in turn. Our review of these issues is de novo. *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006).

14

A.    **The OCCA's Understanding of Supreme Court Case Law Regarding the Prejudice Prong of an Ineffective-Assistance Claim Based on Advice to Plead Guilty**

As noted, the OCCA resolved claim 1 by finding "[t]here is no credible evidence that [Clayton] pleaded guilty *because of* counsel's prediction or promise that he would be paroled, or that he would eventually 'discharge' his life sentence." Aplt. App. vol. I at 187 (emphasis added).  Clayton says this contradicts clearly established Supreme Court precedent governing ineffective assistance of counsel in the context of advice to plead guilty.

Ineffective assistance of counsel means: (1) constitutionally deficient performance by the attorney that (2) prejudices the defendant.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In the context of advice to plead guilty, a defendant shows prejudice by establishing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Clayton argues that the words "because of" in the OCCA's finding show that the OCCA was requiring him to *prove* that he would not have pleaded guilty, rather than merely establishing a reasonable probability.  We rejected a similar argument in *Wood v. Carpenter*, 907 F.3d 1279 (10th Cir. 2018), and we reject the argument here for essentially the same reasons.

The petitioner in *Wood* argued in a state postconviction proceeding that he received ineffective assistance of appellate counsel.  *See id.* at 1288.  A defendant satisfies the prejudice standard for such a claim by showing "a reasonable probability

15

that, but for counsel's unreasonable errors, the outcome of his appeal would have

been different." *Id.* at 1294 (internal quotation marks omitted). The OCCA correctly

stated this standard. *See id.* at 1301. However, when it applied the standard, it used

words that sounded like it was requiring something more than a reasonable

probability: "'Wood could not show that the outcome of his appeal would have been

different.'" *Id.* (brackets omitted). The petitioner therefore argued that the OCCA

"applied the wrong prejudice standard." *Id.* We rejected the argument because state

courts are presumed to know and follow the law and "the OCCA's occasional use of

shorthand to describe the prejudice standard" was not evidence to the contrary. *Id.*

We face materially the same situation here. The entire relevant passage from

the OCCA's decision is as follows:

> In *Hill v. Lockhart*, supra, the Supreme Court held that the
> deficient performance/prejudice test of *Strickland v.
> Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
> (1984) applies to challenges of guilty pleas based on
> ineffective assistance of counsel. The Court further stated
> that to prove *Strickland* prejudice, "the defendant must
> show that there is a reasonable probability that, but for
> counsel's errors, he would not have pleaded guilty and
> would have insisted on going to trial." *Hill*, 474 U.S. at
> 59, 106 S.Ct. at 370.
>
> Petitioner and plea counsel testified at the evidentiary
> hearing concerning counsel's advice before the plea. The
> trial court concluded that Petitioner was properly advised
> that the range of punishment was 20 years to life
> imprisonment. There is no credible evidence that
> Petitioner pleaded guilty because of counsel's prediction or
> promise that he would be paroled, or that he would
> eventually "discharge" his life sentence. The trial court's
> determination that the plea was knowing and voluntary is
> supported by the evidence, and denial of Petitioner's

16

> motion to withdraw the plea on this ground was not an
> abuse of discretion.  Proposition One is denied.

Aplt. App. vol. I at 186–87.  Here, the OCCA quoted the proper prejudice standard

from *Hill*, and we view the words "because of" (three sentences later) as merely a

shorthand for that standard, not an application of a different standard.  *See Wood*,

907 F.3d at 1301.

For these reasons, we reject Clayton's argument that the OCCA unreasonably

applied clearly established Supreme Court precedent.

### B.     The OCCA's "No Credible Evidence" Finding

Again, the OCCA resolved claim 1 by finding "[t]here is no credible evidence

that [Clayton] pleaded guilty because of counsel's prediction or promise that he

would be paroled, or that he would eventually 'discharge' his life sentence."

Aplt. App. vol. I at 187.  The next question is whether this was "an unreasonable

determination of the facts in light of the evidence presented in the State court

proceeding."  28 U.S.C. § 2254(d)(2).

The state understands the OCCA to be saying there is no credible evidence that

Hoch actually made a prediction or promise to Clayton that he would soon be paroled

or discharged.  But that is not what the OCCA said, nor do we have any reason to

infer that the OCCA meant to focus on whether counsel made a promise in the first

place, as opposed to whether the promise induced Clayton to plead guilty.  Indeed,

the inferences point toward a conscious focus on the *effect* of the alleged promise,

rather than its *existence*.  Three sentences before the OCCA stated its "no credible

17

evidence" finding, it quoted the prejudice standard, and that is the only quote from case law in that section of the OCCA's opinion: "[T]o prove *Strickland* prejudice, 'the defendant must show that there is a reasonable probability that, *but for counsel's errors, he would not have pleaded guilty* and would have insisted on going to trial.' *Hill*, 474 U.S. at 59." Aplt. App. vol. I at 186 (emphasis added).[2]

Thus, we take the OCCA's finding at face value. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) ("Deciding whether a state court's decision . . . was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims . . . ." (internal quotation marks omitted)). That finding presumes Clayton's counsel promised or predicted to him that he would soon receive parole or discharge, but it concludes that Clayton failed to prove a reasonable probability that he would not have pleaded guilty but for counsel's advice. We thus turn to the question of whether this was a reasonable factual finding on the

---

[2] We also note that the state's interpretation of the OCCA's finding leads to an inference we are not prepared to accept on this record. The OCCA said there was no credible evidence of reliance on advice *either* about parole *or* about discharge. If this means, as the state contends, that there was no credible evidence Hoch gave such advice, then the OCCA would have needed to conclude: (i) Clayton was not believable when he testified that Hoch promised a parole deal, and (ii) Hoch himself was not believable when he testified that he advised Clayton he could discharge his life sentence. It is possible, of course, for both witnesses to be lying or misremembering, but such a finding would be unusual enough that we would expect the OCCA to state it explicitly, if that is what the court really meant.

record before the OCCA.  We will first discuss the finding as it relates to discharge, and then as it relates to parole.[3]

1.    Advice about Discharge

The OCCA reasonably found that Clayton lacked credible evidence that he pleaded guilty because of Hoch's erroneous advice about discharging a life sentence. In the abstract, it is difficult to imagine a defendant who would *not* rely on such advice.  But the facts of this case are unique.  Beginning with the letter Clayton wrote to Hoch shortly after his 2004 sentencing hearing, and continuing through the evidentiary hearing in 2014, Clayton's *only* relevant accusation against Hoch was that he had arranged a deal by which Clayton would come up for and be granted parole on the murder conviction by December 2004.  Indeed, in the very hearing where Hoch testified about giving *discharge advice*, Clayton continued to accuse Hoch of conveying an unwritten *parole deal*—even though Clayton testified after Hoch.

Clayton's first attempt to reorient his claim around the discharge advice came in his post-hearing supplemental brief.  But, to this day, there is no evidence in the

_____

[3] Throughout his briefing, Clayton continues the approach he employed in his supplemental brief following the state-court evidentiary hearing, *i.e.*, attempting to blend his parole and discharge theories into one.  *See, e.g.*, Opening Br. at 27 ("Mr. Hoch had advised Clayton that he would be home by Christmas because he would discharge, or would be close to discharging, the life sentence . . . .").  We reject this tactic.  There is a material difference between an accusation that defense counsel conveyed an unwritten parole deal and an accusation that defense counsel predicted imminent discharge based on time served.

record (as opposed to attorney argument) that Clayton relied on advice about discharge. For these reasons, the OCCA reasonably found that Clayton did not rely on discharge advice when choosing to enter a blind plea in 2004.[4]

    2.       Reliance on a Promise of Parole

We next ask whether the OCCA reasonably found "[t]here is no credible evidence that [Clayton] pleaded guilty because of counsel's prediction or promise that he would be paroled." Aplt. App. vol. I at 187. The record before the OCCA contains the following evidence (and related inferences) that Hoch's promise of parole induced Clayton to enter a blind plea:

- Clayton's letter, written shortly after sentencing, stating, "Mr. Hoch, you know I would <u>not</u> have plea[ded] blindly to the murder charge without your assurances I would be home with my family by Christmas (2004)," Aplt. App. vol. IV at 246;

- Clayton's own affidavits and testimony stating that he would not have pleaded guilty but for Hoch's promise of parole, *see* Aplt. App. vol. II at 90; Aplt. App. vol. IV at 214; Aplt. App. vol. V at 64;

---

[4] We further note that the state's response brief twice asserts lack of reliance on precisely these grounds (*i.e.*, Clayton alleged an unwritten parole deal, not advice about discharge). *See* Resp. Br. at 43, 47–48. Yet Clayton's reply brief ignores this distinction. To be clear, Clayton has claimed all along that he received advice from Hoch about discharging his "other charges" via time served. *See* Aplt. App. vol. V at 62 (Clayton's affidavit in support of the 2006 petition); *see also* Resp. Br. at 42–43 ("[T]hough there was discussion between Mr. Hoch and Petitioner concerning good time credits, such credits were applicable to the four other crimes to which Petitioner was pleading guilty."). But he never claimed he received advice that he could discharge his murder sentence until after the state-court evidentiary hearing.

- affidavits from Clayton's wife and brother-in-law stating that he would not have pleaded guilty but for Hoch's promise of parole, *see* Aplt. App. vol. V at 79, 82;

- the inference (which Clayton made explicit during the evidentiary hearing, *see* Aplt. App. vol. II at 102) that a defendant in pretrial detention for fifteen months would not suddenly choose to enter a blind plea without some inducement;

- the inference that a defendant who had just extricated himself from a blind plea after twenty years of collateral proceedings would not enter another blind plea without some inducement; and

- the inherent attractiveness of the purported plea deal (*i.e.*, only about three more months in prison).

As for evidence that Clayton did *not* rely on Hoch's promise of parole, the record before the OCCA contained one item, namely, the pre-plea form completed by Hoch on Clayton's behalf (and signed by Clayton), where the answer "No" is circled for the question, "Have you been . . . promised anything by anyone to have you enter your plea(s)?" Aplt. App. vol. V at 7. And, in rebuttal, Clayton testified that Hoch never read that part of the form to him. *See* Aplt. App. vol. II at 101.

"[A]n imperfect or even an incorrect determination of the facts isn't enough for purposes of § 2254(d)(2)." *Grant v. Trammell*, 727 F.3d 1006, 1024 (10th Cir. 2013). It is also not enough that this court "would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). We must

21

defer to the state court's conclusion unless it falls outside the range in which "reasonable minds reviewing the record might disagree." *Id.* (internal quotation marks and brackets omitted). Moreover, Clayton appears not to dispute the state's argument, *see* Resp. Br. at 13, 31, that the state court's factual determination "shall be presumed to be correct" and he bears "the burden of rebutting [that] presumption by clear and convincing evidence," 28 U.S.C. § 2254(e)(1).[5]

Despite this high bar, we are persuaded that Clayton has rebutted the presumption of correctness, and that the OCCA's decision was unreasonable on the record before it. As explained, the OCCA's finding presumes that Hoch told Clayton about an unwritten parole deal. Under that presumption, the *only* piece of evidence contradicting Clayton's claim that this induced him to plead guilty is the pre-plea form's statement that he received no promises. But, if one presumes (as the OCCA did) that Hoch conveyed a parole deal, the pre-plea form loses essentially all evidentiary value because its denial that promises were made is necessarily false.[6]

---

[5] The relationship between § 2254(d)(2) and § 2254(e)(1) is an open question, but Clayton does not dispute § 2254(e)(1)'s applicability, so we presume he must satisfy both § 2254(d)(2) and § 2254(e)(1). *See Johnson v. Martin*, 3 F.4th 1210, 1218 n.4 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1189 (2022), *and cert. denied*, 142 S. Ct. 1350 (2022).

[6] In other words, the "formidable barrier" usually imposed by "the representations of the defendant, his lawyer, and the prosecutor at [a change-of-plea] hearing, as well as any findings made by the judge accepting the plea," *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977), was necessarily overcome in this instance, because the OCCA presumed that a promise of parole existed despite the pre-plea form's denial that any promises were made.

For these reasons, we hold the OCCA unreasonably concluded that "[t]here is no credible evidence that [Clayton] pleaded guilty because of counsel's prediction or promise that he would be paroled." Aplt. App. vol. I at 187.

## C. De Novo Review of Clayton's Claim

Our holding that the OCCA's decision was based on an unreasonable factual determination does not automatically entitle Clayton to habeas relief. Rather, it allows us to review Clayton's ineffective-assistance claim de novo. *See Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011).

Again, ineffective assistance of counsel requires (1) constitutionally deficient performance by the attorney that (2) prejudices the defendant. *Strickland*, 466 U.S. at 687. But "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Here, the question of prejudice is dispositive, so we go directly to that analysis.

As stated previously, the standard for prejudice in this context is "a reasonable probability that, but for counsel's errors, he [1] would not have pleaded guilty and [2] would have insisted on going to trial." *Hill*, 474 U.S. at 59. Thus, it is not enough for Clayton to establish only that he would not have agreed to enter a blind plea but for the promise of parole within a few months. He must also establish that, given correct advice (*i.e.*, pleading blindly would not necessarily advance his parole prospects), he would have elected to go to trial. *See id.* at 60 (holding that the defendant failed to show prejudice because he "did not allege in his habeas petition

23

that, had counsel correctly informed him about his parole eligibility date, he would

have pleaded not guilty and insisted on going to trial").[7]

Clayton's evidence on this issue comprises the following:

- his affidavit, in which he claims that, but for Hoch's promises, he

  "would not have pleaded blindly to the Second Degree Murder charge"

  and "would have exercised [his] right to [a] jury trial," Aplt. App.

  vol. V at 64;

---

[7] Discussing this claim in terms of ineffective assistance and prejudice seems out-of-place given the underlying accusation against Hoch. Clayton does not assert that Hoch gave good-faith but incorrect advice about parole eligibility. He asserts, rather, that Hoch lied to him, or was at least egregiously misinformed, about a deal to make parole within three months. That appears to fit more cleanly within a different claim, namely, that Clayton was coerced into an involuntary plea. *See Machibroda v. United States*, 368 U.S. 487, 493 (1962) ("A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void. A conviction based upon such a plea is open to collateral attack."). And indeed, from 2005 (when he filed his first state postconviction challenge to the 2004 guilty plea) up through the conclusion of the 2014 evidentiary hearing, Clayton argued this claim in terms of voluntariness, not ineffective assistance. After that hearing, however, Clayton reframed the claim around ineffective assistance, emphasizing Hoch's good-faith but incorrect advice about discharge and de-emphasizing the claim about a promise of parole.

Clayton's reframing has two important consequences. First, he failed to exhaust his original voluntariness claim before the OCCA. Viewing Clayton's claim through the ineffective-assistance lens, the OCCA assumed Hoch gave the claimed advice and then skipped to the prejudice element. Had Clayton made clear that he was still arguing simple voluntariness, the OCCA could not have jumped to the prejudice question because no such element exists for a voluntariness claim. In other words, the OCCA would have been forced to decide whether it believed Hoch's testimony or Clayton's testimony about what happened at the pre-plea conference in 2004. Second, Clayton's § 2254 petition argues entirely from an ineffective-assistance perspective, so he forfeited his voluntariness theory in the district court. For these reasons, we also discuss Clayton's claim solely in terms of ineffective assistance.

- his wife's affidavit, which states, "But for the assurances and representations of Mr. Hoch[,] [Clayton] would not have entered a blind plea to the second degree murder charge and would have insisted on going to trial," *id.* at 79; and

- his brother-in-law's affidavit, which likewise states, "But for the assurances and representations of Mr. Hoch, [Clayton] would not have entered a blind plea to the second degree murder charge and would have insisted on going to trial," *id.* at 82.

The district court found this evidence was not enough "to show a reasonable probability that, but for counsel's alleged errors, [Clayton] would have insisted on going to trial. A petitioner's mere allegation that he would have gone to trial is insufficient." *Id.* at 137–38 (citing *Miller v. Champion*, 262 F.3d 1066, 1072 (10th Cir. 2001)). We agree. These assertions are conclusory, essentially mimicking the language of *Hill*, which is not enough. *See Miller*, 262 F.3d at 1072. A defendant must "persuade[] us that going to trial would have been rational in light of the objective circumstances of his case." *Heard v. Addison*, 728 F.3d 1170, 1184 (10th Cir. 2013). This usually involves discussion of factors such as unmade but available legal and evidentiary arguments and affirmative defenses, the weight of the evidence against the defendant, the risk of an unsympathetic jury, and sentencing exposure. *See id.* at 1183, 1186. At a minimum, however, the defendant must provide *some* explanation why he or she would rationally take the risk of going to trial. *See, e.g.*, *Lee v. United States*, 137 S. Ct. 1958, 1967–69 (2017) (holding that the difference

25

between certain deportation upon pleading guilty and almost certain deportation after trial was a rational reason to insist on going to trial, given a defendant whose overriding priority was to avoid deportation).

Despite the district court's explicit conclusion that Clayton's insistence on going to trial did not rise above a "mere allegation," Aplt. App. vol. V at 137–38, Clayton's opening brief contains no relevant discussion of this point. Instead, as in the district court, he continues to assert that he would have gone to trial, with no further explanation. *See* Opening Br. at 12, 18–19. Moreover, the state, in its response brief, accuses Clayton of precisely this fault, *see* Resp. Br. at 40–41, and Clayton's reply brief again offers no explanation. Thus, Clayton has failed to support his claim that he likely would have gone to trial.

The state further argues that going to trial would not have been rational given that his prior convictions made him eligible for a life sentence on each of the five charges against him. *See id.* at 41–42. But pleading blindly likewise exposed him to a life sentence on all charges. Thus, absent more factual context (which the state does not provide), we do not see how sentencing exposure would make going to trial irrational.

Even so, the state's argument draws our attention to a feature of Clayton's claim that further demonstrates his failure to support the prejudice element. Clayton, his wife, and his brother-in-law specifically said he would not have pleaded guilty *to the second-degree murder charge* and would have instead gone to trial, as if he could have pleaded differently to that charge alone. *See supra*. This is consistent with

26

Clayton's letter to Hoch shortly after the 2004 sentencing. *See* Aplt. App. vol. IV at 247 ("Mr. Hoch, in view of these matters I am requesting you to appeal or withdraw my plea to count one (murder) . . . ."). But, as far as we are aware, this is not the situation Clayton faced in 2004 when he was deciding whether to plead guilty. Clayton points us to nothing in the record suggesting he could have pleaded guilty to the non-murder charges and then gone to trial on the murder charge, much less that Hoch advised him to this effect. Thus, his insistence that he would have taken the murder charge to trial is not only conclusory, but also refers to a choice that apparently was never before him when deciding whether to plead guilty.

Clayton therefore has not met his burden to establish prejudice. *Heard*, 728 F.3d at 1184. Accordingly, he fails to prove his ineffective-assistance claim.

## IV.   DENIAL OF COA AS TO INADEQUATE-FACTUAL-BASIS CLAIM

The second claim Clayton litigated in the district court was that, when pleading guilty, he did not admit enough facts to satisfy the "depraved mind" element of second-degree murder under Oklahoma law. *Cf.* Okla. Stat. tit. 21, § 701.8(1) ("Homicide is murder in the second degree . . . [w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual . . . ."). Our order granting a COA on his ineffective-assistance claim said nothing about his inadequate-factual-basis claim. We now explain why the latter claim does not merit a COA.

27

Before the state courts and the district court, Clayton argued that, at most, he satisfied only the "imminently dangerous" element by running a red light.  But the OCCA held that "operating a vehicle in a reckless and unsafe manner while attempting to avoid apprehension for a felony is imminently dangerous conduct evincing a depraved mind and extreme disregard of a high risk of injury or death to others."  Aplt. App. vol. I at 187.

"[T]his court is bound by the state court's interpretation of its own law." *Hawkins v. Mullin*, 291 F.3d 658, 662 (10th Cir. 2002).  Clayton asserts, however, that he "has not found a single case from the Oklahoma Court of Criminal Appeals that would support a conviction for [s]econd [d]egree depraved mind murder when an accused admits to simple inattentive or reckless driving, without more."  Mot. for a COA at 31.  Perhaps this alludes to the theory that a state court's interpretation of state law can be "so arbitrary or capricious as to constitute an independent due process . . . violation."  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  But Clayton does not specifically argue as much.  And if he meant to, he did not properly exhaust this claim in his state postconviction proceeding.  *See Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (holding that, to properly exhaust a claim that a state-law error amounted to a federal constitutional violation, the state prisoner must alert the state courts to the federal constitutional problem).

For these reasons, "reasonable jurists would [not] find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529

28

U.S. 473, 484 (2000). We therefore deny a COA as to Clayton's claim that his guilty plea lacked an adequate factual basis.

## V. CONCLUSION

For the reasons stated above, we affirm that portion of the district court's judgment denying § 2254 relief on Clayton's ineffective-assistance-of-counsel claim. We deny a COA as to the portion of the district court's judgment denying § 2254 relief on Clayton's inadequate-factual-basis claim.

Entered for the Court


Nancy L. Moritz
Circuit Judge